DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ALDO DISORBO,**
Appellant,

v.

**AMERICAN VAN LINES, INC.,**
Appellee.

No. 4D21-2994

[January 4, 2023]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carol-Lisa Phillips, Judge; L.T. Case No. CACE15-016745.

Julissa Rodriguez of Shutts & Bowen, LLP, Miami, Jason Gonzalez and Amber S. Nunnally of Shutts & Bowen LLP, Tallahassee, Elise M. Engle of Shutts & Bowen LLP, Tampa, and Robert S. Hackleman and Helaina Bardunias of Katzman, Wasserman, Bennardini & Rubenstein, P.A., Boca Raton, for appellant.

Paul O. Lopez, Stephanie C. Mazzola, and Jennifer H. Wahba of Tripp Scott, P.A., Fort Lauderdale, and Kenneth Minerley and Meghan Miller of Minerley Fein, P.A., Boca Raton, for appellee.

GROSS, J.

Article I, Section 22 of the Florida Constitution guarantees a jury trial as to those issues triable by a jury at common law, before the first state constitution became effective in 1845. Complications arise when legal and equitable causes of action travel in the same complaint; in that situation, a jury must decide common issues of fact to honor the guarantee of Article I, Section 22. Here, the trial court erred in severing a breach of contract claim and trying various equitable claims first. The court's factual determinations necessarily foreclosed relief on the pending breach of contract claim. We therefore reverse.

Factually, the case is not complex. Two brothers were part owners of a business. They disagreed about the terms under which the business was to be run and the circumstances surrounding a $200,000 bank loan. The

case was complicated by an eleven-count complaint containing overlapping causes of action and different requests for relief.

We state the facts below as they were developed at the non-jury trial.

### Ownership and Operation of A.S.A.P. Investment Holdings, LLC

In April 2009, brothers Aldo and Anthony DiSorbo, along with their cousins Phillip and Stefano Vento, formed A.S.A.P. Investments Holdings, LLC ("ASAP"). Originally, Aldo and Anthony each owned 32.5% of ASAP, while Phillip and Stefano each owned 17.5%. ASAP was to serve as a real estate holding company. Like many family businesses, ASAP was run informally.

### ASAP Purchases a Warehouse

In May 2009, ASAP purchased property that included a roughly 54,000 square foot warehouse. The property cost $2.4 million. ASAP paid for the property with a $1.9 million loan from Bank of America, along with capital contributions from the initial members in amounts proportional to their respective membership interests. Aldo and Anthony each contributed about $147,000.

Before ASAP's purchase, the warehouse had been abandoned for three years and had roof and drainage system problems. According to Anthony, ASAP's members "decided not to put the money in the company" to fix those issues.

### The 2009 Leases

Later in 2009, ASAP leased the property to two tenants.

The first lease was with S.V.P. Tile & Marble, Inc. ("SVP Tile"), a company owned by the Ventos, which rented a portion of the warehouse for $4,900 per month, plus taxes, insurance, and other costs.

The second lease, for the remaining portion of the warehouse, was with American Van Lines, Inc. ("AVL"), a company owned by Anthony; that lease called for rent of $9,100 per month, plus taxes, insurance, and other costs. On the second lease, Aldo signed on behalf of ASAP and Anthony signed for AVL.

At trial, Anthony testified that they put the 2009 AVL lease in place "because the Bank of America needed a lease in place." Anthony described this lease as "a placeholder . . . of what we should be paying, just to show something to the bank."

Phillip Vento testified that SVP Tile never wrote a check to ASAP for $4,900 a month. Instead, the Ventos paid "whatever was due for the expenses of the month" for "the mortgage, the taxes and insurance."

Consistent with this trial testimony, the trial judge later found that "these lease agreements were never formally followed and they merely served as placeholders."

Both Aldo and Anthony said that the rental payments were generally intended to cover building expenses, including the mortgage, taxes, insurance, and maintenance costs.

After his initial investment, Aldo did not contribute to the debt service, taxes, insurance, or other expenses, except for a 2010 capital contribution for maintenance of the building. Aldo viewed his investment was an "equity play"—he was hoping the building would appreciate in value while someone else picked up the debt service. Aldo said that ASAP made no distributions to him and the other co-owners between 2009 and 2012. During this time, Aldo did not take issue with this arrangement or ask that the leases be restructured.

### Anthony Proposes Purchasing the Ventos' Interests

In early 2012, Anthony approached the Ventos about purchasing their membership interests in ASAP. The Ventos were willing to sell their ownership interests for $288,000, plus the termination of SVP Tile's lease obligations and a release of their personal guarantees to Bank of America.

To complete the purchase of the Ventos' interests, a $200,000 loan from Bank of America was obtained. The DiSorbo brothers have significant factual disagreements surrounding this loan transaction.

Aldo testified that Anthony asked him to assist in getting a loan from Bank of America to purchase the Ventos' interests in the company, which would result in Aldo and Anthony each owning 50% of ASAP. Aldo saw this as a good opportunity, and he told Anthony to take the lead.

By contrast, Anthony denied telling Aldo that they were going to use the loan proceeds to purchase the Ventos' interest on a 50/50 basis.

3

A credit approval from Bank of America states that "[t]he Ventos, cousins of DiSorbo, are selling their interest to the brothers who will own ASAP 50/50."

However, once the loan was approved, Anthony came to Aldo and said that he wanted to buy out the Ventos on his own. Aldo initially refused to guarantee the loan, but he went forward after Anthony said that "he was going to use his own money to buy out the Ventos." Aldo also testified that the loan proceeds were "supposed to go into the ASAP account for business purposes only to repair the building." Aldo also claimed that his participation in the new loan agreement was based on his agreement with Anthony that ASAP would pay fair market value on a new lease on which Aldo would realize "about $100,000 to $120,000 a year."

Anthony denied that any agreement existed about ASAP paying fair market rent. Anthony claimed that Aldo did not begin demanding an increase in rent to the fair market value until after a 2013 heated dispute in which they decided to separate their businesses. Anthony refused to increase the rent because "the deal was always the same."

### ASAP Obtains a $200,000 Loan, Which Anthony Uses to Buy Out the Vento Brothers

In April 2012, ASAP obtained a second loan from Bank of America in the amount of $200,000. Aldo and Anthony each personally guaranteed the loan.

The loan agreement lists ASAP as the borrower, describes the property as collateral, requires the loan proceeds to be used "only for business purposes," and contains a covenant requiring that ASAP was "[n]ot to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value."

Another covenant in the loan agreement stated that the intended use of the property was "[t]o cause [AVL], an entity affiliated with the Borrower (the 'Affiliate'), to occupy the property collateral for the conduct of its regular business." This covenant further states:

> If the real property is leased to [AVL], the lease will be fully subordinated to the Bank's lien. All terms, covenants, representations, and provisions of this Agreement which pertain or apply to the Borrower will pertain or apply to [AVL]

4

in addition to, or in lieu of, the Borrower, as the context may require.

Aldo and Anthony each signed the loan agreement on behalf of ASAP.

Attorney Steven Elkin represented ASAP as its corporate counsel and acted as the settlement and closing agent in connection with the loan. Aldo was copied on emails from Elkin confirming that Anthony was to receive the net loan proceeds, the money "was being used to enable Anthony DiSorbo to purchase the membership interest of Steve Vento and Phil Vento," and Aldo "gets no benefit from this transaction." Aldo did not inform Elkin, by email or otherwise, that he objected to the proposed disposition of the loan proceeds.

On April 20, 2012, Elkin distributed the net proceeds of the $200,000 loan to the personal bank account of Anthony and his wife. Aldo was not copied on Anthony's email instructing Elkin to "wire the money to my account."

Anthony then paid the loan proceeds, along with about $88,000 of his own money, to the Ventos. Following the Ventos' receipt of $288,000, they executed an Assignment Agreement and Resignation, transferring their interests in ASAP to Anthony. Anthony signed the Assignment Agreement, but Aldo did not. Anthony did not follow attorney Elkin's advice about how to document his purchase of the Ventos' interests.

In the years following the disbursement of the 2012 loan, Aldo received K-1 tax schedules reflecting that he was still a 32.5% owner of ASAP. Likewise, in numerous emails after the closing of the 2012 loan, Aldo made statements acknowledging that he was a 1/3 owner of the warehouse. Also, a bookkeeper for AVL testified that it was clear from her discussions with Aldo that he understood Anthony had used the money from the second Bank of America loan to buy out the Ventos.

### Anthony Allegedly Leases the Warehouse for Below-Market Rent

Prior to the closing on the $200,000 loan, on April 1, 2012, ASAP and AVL entered into a new lease that allowed AVL to occupy the entire warehouse for the same base monthly rent—$9,100 plus taxes, insurance and other costs. Anthony signed the lease on behalf of both ASAP and AVL.

The new lease required AVL at its sole expense to maintain the premises "in good repair and condition, including but not limited to, the building and electrical, plumbing and HVAC." A separate provision of the lease prohibited AVL from making any improvements or other construction or work of any structural nature without the prior written consent of ASAP.

Aldo testified that he was unaware of the April 1, 2012 lease when he signed the loan agreement. However, Aldo signed all the loan documents, including a subordination agreement referencing the April 2012 lease.

At trial, Anthony admitted that he did not know what the fair market rent for the warehouse would have been at the time he signed the April 2012 lease. By contrast, Aldo's expert testified that from 2012 through the time of trial, AVL paid ASAP about $2.4 million less than fair market rent.

In 2013 and 2014, Anthony arranged for ASAP to enter into two lease transactions that benefitted AVL.

In 2013, ASAP leased 2,000 square feet of the warehouse to a third party, Nextran, at a substantially higher amount per square foot than AVL was paying. The lease structure was changed in 2014 so that Nextran was subleasing the space from AVL and making payments to AVL.

### *Addendum to the 2012 Lease*

In April 2014, without consulting with Aldo, Anthony signed an addendum to the 2012 lease on behalf of both AVL and ASAP, extending the lease through 2022 on the same terms, including the rental price of $9,100. Anthony admitted that he did not know whether this addendum was a fair market value extension of the 2012 lease, but believed it was fair to ASAP because it was the same deal as before, "that we all agreed early on [] was fair."

### *Repayment of the $200,000 Loan*

The $200,000 loan was recorded in ASAP's books as a liability to Bank of America. ASAP made repayments on the loan to Bank of America. However, one of Aldo's experts conceded that if the purchase of the Ventos' interests "was an agreed transaction outside the company," there would be nothing wrong from an accounting standpoint with correcting the journal entries. He explained: "That's done all the time."

6

Another of Aldo's experts clarified how the repayments were occurring. In essence, AVL was paying an additional $2,111.60 per month to ASAP, which was being treated on ASAP's books as "additional rent." This amount "happened to be the monthly payment that ASAP had to make to the Bank of America loan."

Anthony's expert testified that ASAP's books reflected that the April 2012 loan was "[d]ue from Anthony DiSorbo." Anthony's expert explained that "while the loan is on the books [of ASAP] as a liability, Anthony is paying that loan every month."

In 2017, after receiving a civil theft letter during the litigation, Anthony paid off the remaining balance on the $200,000 loan.

### *The Lawsuit and the Operative Complaint*

On September 25, 2015, Aldo initiated this lawsuit, seeking dissolution of ASAP and other relief. Pursuant to section 605.0706, Florida Statutes (2015), Anthony filed and served his election to purchase Aldo's entire interest in ASAP in lieu of dissolution.

Aldo eventually filed a Fourth Amended Complaint asserting the following 11 counts:

> Count I – Declaratory Judgment (individual claim), which sought a declaration that the transfer of the Ventos' membership interests to Anthony was void or alternatively that Anthony purchased the Ventos' membership interests in trust for ASAP.
>
> Count II – Judicial Dissolution of ASAP (individual claim).
>
> Count III – Breach of Fiduciary Duty (derivative and individual claim against Anthony).
>
> Count IV – Dissociation as Member under § 605.0602, Fla. Stat. (derivative and individual claim against Anthony, seeking to dissociate him as a member of ASAP).
>
> Count V – Breach of Duty of Loyalty (derivative claim against Anthony).
>
> Count VI – Conversion (derivative and individual claim against Anthony).

Count VII – Fraudulent Misrepresentation and Fraudulent Concealment (derivative and individual claim against Anthony).

Count VIII – Civil Theft (derivative claim against Anthony).

Count IX – Breach of Contract (individual claim against Anthony).

Count X – Unjust Enrichment (derivative claim against Anthony and AVL).

Count XI - Aiding and Abetting Breach of Fiduciary Duty (derivative claim against AVL).

As we explain below, the legal issue in this case turns on the existence of common issues of fact that Counts X and XI share with the remaining counts, with a focus on Count IX. It is therefore necessary to discuss some of the claims in more detail.

In a nutshell, the Fourth Amended Complaint alleged that Anthony engaged in unauthorized self-dealing transactions and misappropriated the $200,000 loan proceeds belonging to ASAP to fund his purchase of the Ventos' membership interests in the company. The complaint asserted that Anthony's purchase of the Ventos' membership interests was null and void because it did not comply with the Operating Agreement. In the alternative, the complaint asserted that "ASAP is the beneficial owner of the membership interests Anthony acquired with ASAP's funds, and Anthony is required to hold those corporate assets in trust for ASAP."

Count III alleged that Anthony breached his fiduciary duties to ASAP and Aldo by, among other things, (i) misappropriating ASAP's assets, including the $200,000 loan proceeds, (ii) improper self-dealing, including causing ASAP to enter into the 2012 AVL lease, (iii) failing to perform roof maintenance and other required repairs, (iv) usurping company business opportunities, and (v) wasting of ASAP's assets. Count III requested damages for these alleged breaches or, alternatively, the imposition of a constructive trust over the membership interests Anthony acquired using ASAP's loan proceeds. Counts IV and V contained substantially similar underlying allegations.

Count VI alleged that Anthony converted ASAP's property by misdirecting ASAP's loan proceeds to his personal bank account.

8

Alternatively, Count VI alleged that Anthony converted Aldo's property by taking a distribution from ASAP to which he was not entitled without providing Aldo his pro rata share or by "misappropriating the entire 35% membership interest purchased with ASAP's funds for his own personal benefit." Count VI requested, among other things, "a judgment against Anthony for compensatory damages, including the value of the converted assets[.]"

Count VII alleged that Anthony made fraudulent misrepresentations to Aldo and ASAP. Although most of the alleged damages were to ASAP, Count VII also requested that if the loan proceeds were "determined to be a distribution to Anthony," the court should award Aldo the value of the pro rata distribution he should have received. Alternatively, Aldo sought "the imposition of a constructive trust over the membership interests Anthony acquired using ASAP's Loan Proceeds."

Count IX was pleaded exclusively as an individual claim by Aldo for breach of contract against Anthony. The count alleged that Anthony breached his obligations under the Operating Agreement, including section 12.8 (requiring each member to indemnify the other member for acts done outside the scope of the Operating Agreement), section 12.9 (stating that no member shall be liable to the other member for actions in connection with the company, "except in the event of a violation of any provision of this Agreement, fraud, gross negligence or dishonest conduct"), section 12.10 (stating that the indemnities provided in the Operating Agreement "shall include reasonable attorney's fees"), and section 14.10 (requiring each member to act in good faith in discharging their obligations under the Operating Agreement), or, if the loan proceeds were alternatively determined to be a distribution, section 8.1 (governing how distributions of net cash flow are to be paid).

Count IX alleged that Aldo suffered damages including "exposing him to a greater risk under the personal guaranty he provided to Bank of America in connection with the $200,000 Loan and preventing Aldo or companies he owns from leasing space at the Warehouse at fair market rent." Alternatively, Count IX alleged that "Anthony's breach of the Operating Agreement unlawfully diluted Aldo's ownership percentage in ASAP." Count IX requested damages, interest, fees and costs.

Counts X and XI were the only counts against AVL.

Count X primarily sought a judgment against Anthony and AVL "for the value of benefits and assets transferred to them by ASAP," alleging that AVL was unjustly enriched because ASAP conferred a benefit on AVL in

the form of "below-market leases and failing to require AVL to make repairs as required under its lease."

Count XI alleged that AVL aided and abetted Anthony's breaches of his fiduciary duties by actively and knowingly participating in the unlawful use of ASAP's assets, including by occupying the property under the new lease without paying fair market rent to ASAP and failing to perform the routine roof maintenance and other repairs.

Finally, the Fourth Amended Complaint demanded "a trial by jury on all issues so triable as of right."

Over Aldo's objection, the trial court set Counts II-VIII, X, and XI for non-jury trial. The court stayed Count IX, Aldo's breach of contract claim, pending non-jury trial on all of the other counts.[1]

### *The Disposition in the Trial Court*

After a non-jury trial, the circuit court dismissed the civil theft claim against Anthony and entered an Amended Final Judgment against Aldo as to every remaining count except Count IX, Aldo's breach of contract claim.

The court determined that Aldo had a "32.5% interest in the fair value of ASAP as of December 14, 2015."

On the issue of the $200,000 loan, the trial court found that "not only was Aldo aware in 2012 that the BOA Loan Proceeds were being used solely by Anthony to buy out the Ventos' membership interest, but that Aldo had

---

[1] Aldo filed a petition for writ of certiorari in this court seeking review of the order setting the case for trial. The petition argued that the trial court departed from the essential requirements of law by bifurcating the trial of inextricably intertwined legal and equitable claims. A different panel of this court declined to issue the writ, but the panel did not indicate that the denial was on the merits. Unelaborated denials of certiorari are not deemed denials on the merits. *Topps v. State*, 865 So. 2d 1253, 1258 (Fla. 2004). Although a dismissal of the petition would have been more appropriate procedurally, the panel may well have denied relief because Aldo had an adequate remedy on direct appeal. The common law writ of certiorari is an "extraordinary remedy" that will lie only when the order, departing from the "essential requirements of law," will leave "no adequate remedy on appeal." *Mintz Truppman, P.A. v. Cozen O'Connor, PLC*, 346 So. 3d 577, 579 n.6 (Fla. 2022). Furthermore, "the time, trouble and expense of going through an unnecessary trial are not the type of material injuries sufficient to justify invocation of this court's certiorari jurisdiction." *Pages v. Dominguez By & Through Dominguez*, 652 So. 2d 864, 868 (Fla. 4th DCA 1995).

no objection to same." The court added that "[t]here was sloppy, improper tax documents, bookkeeping, credits, etc. but the parties agreed and all knew what was going to happen and what happened."

On the issue of below-market rent, the court found:

> [T]here was no evidence of any agreement by and between any of the members of ASAP to pay or charge fair market rent for the leasing of space at the Property nor was there any evidence as to any agreement by and between the members of ASAP as to what amount would constitute fair market rent.

Instead, the court noted, "the course of dealing established by the members of ASAP from inception was that they would cover all of the expenses connected to the Property in accordance with their percentage ownership with the exception of major capital improvements." The court explained: "The testimony at trial reflected that the rental amounts delineated in the [2009 Lease Agreements] served as a rough estimate of the Property's monthly expenses, such that the Ventos and Anthony contributed monies each month to cover the expenses for the building."

On the issue of the condition of the property, the trial court found that the property "suffered from significant roofing issues that would require a roof replacement as well as pre-existing drainage issues" of which Aldo and Anthony were aware at the time of purchase. The court also ruled that "the roof, along with [certain other] repair/replacements/additions are above and beyond mere maintenance, repair issues."

As to Count I, the trial court determined that the transfer of the Ventos' membership interests to Anthony was valid, making him a 67.5% owner of ASAP.

As to Count II, the trial court dismissed Aldo's petition for dissolution, concluding that "Anthony properly and timely filed a notice of election to purchase Aldo's interest pursuant to Fla. Stat. § 605.0706 (2015)."

As to Counts III and V, the trial court relied upon the business judgment rule in concluding that Anthony did not breach his fiduciary duties:

> Here, the business judgment rule precludes a finding of breach of fiduciary duties by Anthony. The evidence demonstrates that Anthony acted to the benefit of ASAP in covering all of the Property's expenses, including the

11

associated mortgages, insurance, taxes, and maintenance. Moreover, Anthony's actions were consistent with the original understanding of how ASAP would be operated.

The evidence does not support a finding of breach under these circumstances as ASAP's sole asset has been preserved and maintained at Anthony's sole expense since 2012.

(citation and paragraph numbers omitted).

The trial court also ruled against Aldo on each of the remaining counts, including the two counts involving AVL. As to Count X for unjust enrichment, the trial court ruled "in favor of Anthony and AVL based on the record evidence and testimony adduced at trial." As to Count XI for aiding and abetting breach of fiduciary duty against AVL, the trial court ruled that this claim failed because Aldo "cannot prove breaches of fiduciary duty under the business judgment rule."

Based on its findings, the trial court ordered that "Final Judgment is hereby granted in favor of" Anthony and AVL.

After Aldo filed his Notice of Appeal, we dismissed the appeal for lack of jurisdiction as to Anthony because Count IX was still pending, noting that dismissal was without prejudice to Aldo seeking appellate review once the trial court adjudicated the remaining claim involving Anthony. For this reason, this appeal involves AVL only.

### *Article I, Section 22 of the Florida Constitution Guarantees the Right of a Jury Trial of Factual Issues Common to Equitable and Legal Causes of Action*

Among other things, Aldo argues on appeal that the non-jury trial deprived him of a jury trial on factual issues common to both equitable and legal claims.

Article I, Section 22 of the Florida Constitution "guarantees the right to trial by jury in those cases in which the right was enjoyed at the time this state's first constitution became effective in 1845." *In re Forfeiture of 1978 Chevrolet Van VIN: CGD1584167858*, 493 So. 2d 433, 434 (Fla. 1986). In construing an earlier version of the Florida Constitution, our supreme court explained that the jury trial provision was "designed to preserve and guarantee the right of trial by jury in proceedings, according to the course of the common law as known and practiced at the time of the adoption of the Constitution." *Hawkins v. Rellim Inv. Co.,* 110 So. 350, 351 (Fla. 1926).

Article I, Section 22 operates to preserve the right to a jury trial where legal and equitable causes of action travel in the same complaint. *Billian v. Mobil Corp.*, 710 So. 2d 984, 992 (Fla. 4th DCA 1998). "[I]t is well settled that where mixed equitable and legal claims are presented on interrelated facts, the trial court first must have a jury decide the case so as to preserve the parties' right to a jury trial." *Kavouras v. Mario City Rest. Corp.*, 88 So. 3d 213, 214 (Fla. 3d DCA 2011). In *Billian*, we summarized the law in this area:

> Unless waived, *a jury must make findings concerning all facts which are common to the legal and equitable claims* before the trial court may consider granting an equitable remedy. Where the fact issues decided by a jury in an action at law are sufficiently similar to the fact issues on a related equitable claim, the trial court is bound by the jury's findings of fact in making its ruling on the equitable claim. *Legal and equitable issues are "sufficiently similar" or "intertwined" if a jury, in order to return a verdict in an action at law, would necessarily have to decide a fact issue of the legal claim which is also a required element of an equitable claim.*

710 So. 2d at 992 (emphasis supplied; citations omitted).

### Count IX Alleged a Direct Legal Claim for Breach of Contract

Count IX of the operative complaint alleged a cause of action for breach of contract. AVL contends that Count IX is in actuality a derivative claim for which no right to a jury trial exists. We reject AVL's contention, concluding that the count involved a special injury to Aldo that entitled him to a jury trial on the breach of contract claim.

A direct or individual action is a suit to enforce a right of action existing in the stockholder or member, while a derivative action is a suit to enforce a right of action existing in the company. *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999). "Historically, a shareholder's derivative action could be brought only in equity." *Lanman Lithotech, Inc. v. Gurwitz*, 478 So. 2d 425, 426 (Fla. 5th DCA 1985). Because "the common law in 1845 did not confer a right to jury trial in equity actions," no such right exists in a derivative action. *Id.* at 427. "This, of course, would not prevent the trial judge from granting a jury trial as a matter of discretion." *Id.* at 427 n.4.

The right to a jury trial in Florida turns on "whether the party seeking a jury trial is trying to invoke rights and remedies of the sort traditionally enforceable in an action at law." *King Mountain Condo. Ass'n v. Gundlach*, 425 So. 2d 569, 571 (Fla. 4th DCA 1982). A cause of action for damages for an alleged breach of contract is one triable by jury at common law. *Olin's, Inc. v. Avis Rental Car Sys. of Fla.*, 131 So. 2d 20, 22 (Fla. 3d DCA 1961).

"The mere use of the label 'damages' is not sufficient to create a right to jury trial. Rather, the right to trial by jury turns on the nature of the right and remedy sought to be enforced." *Gundlach*, 425 So. 2d at 571 (citation omitted). In *Gundlach*, we held that the plaintiffs were not entitled to a jury trial on their claim for breach of fiduciary duty, because they were seeking "disgorgement of secret profits obtained by the developer-appointed, initial officers and directors of a condominium association," which was an equitable remedy that "does not give rise to a right of trial by jury." *Id.* at 572.

"In order for shareholders to bring a direct action in their individual capacity, the shareholders must allege both a direct harm and a special injury." *Strazzulla v. Riverside Banking Co.*, 175 So. 3d 879, 884–85 (Fla. 4th DCA 2015). Similarly, under the statute governing limited liability companies, a member maintaining a direct action "must plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." § 605.0801(2), Fla. Stat. (2015).[2]

Under this two-prong test, a direct action may be brought only if "(1) there is a direct harm to the shareholder or member such that the alleged injury does not flow subsequently from an initial harm to the company **and** (2) there is a special injury to the shareholder or member that is separate and distinct from those sustained by the other shareholders or members." *Dinuro Invs., LLC v. Camacho*, 141 So. 3d 731, 739–40 (Fla. 3d DCA 2014). A shareholder may also "bring an individual action as an exception to the two-prong test where there is a separate statutory or contractual duty owed by the wrongdoer to the individual shareholder." *Strazzulla*, 175 So. 3d at 885.

---

[2] For purposes of this opinion, we will assume, without deciding, that the 2015 statutes apply to this action. *See* § 605.1108(2), Fla. Stat. (2015) (effective January 1, 2015, the Florida Revised Limited Liability Company Act "governs all limited liability companies").

"An injury is not direct if it flows first to the company and only secondarily to the aggrieved shareholder, such that it only damages the shareholders or members *due to the loss in value of their respective ownership interest.*" *Arbitrage Fund v. Petty*, 307 So. 3d 119, 125 (Fla. 3d DCA 2020) (emphasis added; internal quotation marks omitted). "[M]ost corporate self-dealing and mismanagement claims do not meet the special injury test announced in *Dinuro*[.]" *Id.* at 129.

By contrast, where plaintiffs have alleged that the defendants' "actions resulted in damages in the form of a loss to their equity ownership in [the] LLC and a decrease in financial benefits to them," they have "alleged an injury separate and distinct from that suffered by other members of the LLC." *Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1209 (D. Kan. 2004).

Here, Count IX alleged both direct harm and special injury. Count IX alleged that Anthony breached his obligations under the Operating Agreement, including section 14.10, which required each party to act in good faith with respect to discharging their obligations under the agreement. The factual basis for this breach was that Anthony misappropriated the $200,000 loan proceeds and entered into self-dealing, below-market leases on behalf of ASAP. Count IX also included the allegation that, if the loan proceeds were alternatively determined to be a distribution, Anthony violated section 8.1 of the Operating Agreement, governing how distributions of net cash flow are to be paid.

One of the claimed injuries in Count IX was that "Anthony's breach of the Operating Agreement unlawfully diluted Aldo's ownership percentage in ASAP." This was a sufficient allegation of direct harm and special injury. Notably, this alleged injury did *not* flow first to the company and only secondarily to Aldo. Rather, the Fourth Amended Complaint alleged that Aldo suffered a dilution of his ownership percentage in ASAP from 50% to 32.5%, making him a minority owner instead of an equal owner. This was a special injury to Aldo that was separate and distinct from that experienced by Anthony—the dilution harmed only Aldo and did not harm Anthony.[3]

_____

[3] Because we have determined that the contract claim stated an action at law entitled to a jury trial, we need not reach the issues of whether the breach of fiduciary duty, conversion, and fraud counts encompassed direct claims that would similarly require a jury trial to resolve issues of fact common to the derivative claims.

15

### The Trial Court Erred by Trying the Equitable, Derivative Claims Separately, While the Breach of Contract Claim was Still Pending

Aldo's breach of contract claim was factually intertwined with the equitable claims, requiring a jury to resolve the common factual issues. The contract claim and the equitable claims are intertwined because they all revolve around underlying factual issues regarding Anthony's purported mismanagement of ASAP by entering into below-market leases and his alleged misappropriation of loan proceeds from the second Bank of America loan to purchase the Vento brothers' membership interests for himself.

Thus, the core factual disputes should have been tried to a jury, with the jury making findings concerning those material facts common to the legal and equitable claims. Bound by the jury's findings of fact, the trial court could then have ruled on the equitable claims. In other words, the proper procedure is "for the trial court to first proceed with the jury trial, and then to apply the jury's factual findings to determine whether [Aldo] has established entitlement to [his] equitable claims." *Marlette v. Carullo*, 347 So. 3d 556, 559 (Fla. 2d DCA 2022).

The trial court mistakenly relied upon the principle that a plaintiff may not join individual and derivative claims in one action. That principle is a pleading issue unrelated to the preservation of the right to a jury trial on certain actions at law.

There is authority that direct claims and derivative claims cannot be joined in the same action because they are brought in different capacities. *See* Fla. R. Civ. P. 1.110(g) ("A pleader may set up in the same action as many claims or causes of action or defenses *in the same right* as the pleader has[.]") (emphasis added); *Gen. Dynamics Corp. v. Hewitt*, 225 So. 2d 561, 563 (Fla. 3d DCA 1969) (holding that the plaintiff did not have the right to join a derivative claim with his individual claims in one action because "[o]ne cannot in the same action sue in more than one distinct right or capacity" (quoting 1 Am. Jur. 2d Actions § 125)).

In this case, however, neither Anthony nor AVL moved to dismiss Aldo's complaint on the basis that Aldo had joined individual and derivative claims in one action. This pleading issue has nothing to do with whether claims should be tried together so as to preserve the right to a jury trial on a legal claim where the legal and equitable claims are factually intertwined.

16

Had the trial court granted a motion to dismiss, and Aldo filed his non-derivative claims in a separate lawsuit, he could have moved for a joint trial or for consolidation of the actions under Florida Rule of Civil Procedure 1.270(a) because the cases involved common questions of fact. "Although a shareholder's derivative action is basically an action in equity, there is authority for the proposition that in some instances, a trial by jury may be proper." *Hiles v. Auto Bahn Federalization, Inc.*, 555 So. 2d 1218, 1220 (Fla. 4th DCA 1989). For example, in *Vine v. Scarborough*, 517 So. 2d 726, 728 (Fla. 3d DCA 1987), the Third District explained that "the legal and equitable claims were so intertwined that the parties herein should have been, and were properly given, a jury trial on all issues."

### *The Trial Court Erroneously Relied Upon the Business Judgment Rule to Decide Count XI*

Because the issue might arise on retrial, we address the trial court's application of the business judgment rule to decide Count XI.

We conclude that the business judgment rule has no application to this case.

Under the business judgment rule, "corporate directors generally have wide discretion in the performance of their duties and a court of equity will not attempt to pass upon questions of the mere exercise of business judgment, which is vested by law in the governing body of the corporation." *Lake Region Packing Ass'n v. Furze*, 327 So. 2d 212, 216 (Fla. 1976).

"[C]ourts assume that directors and officers have acted properly and in good faith, and *absent a showing of abuse of discretion, fraud, bad faith or illegality*, will decline to review their actions." *Fed. Deposit Ins. Corp. v. Copenhaver*, 8:13-cv-2037-T-33TBM, 2014 WL 12621202, at *7 (M.D. Fla. May 10, 2014) (emphasis added). In other words, the business judgment rule "suggests that the decisions of directors will not be questioned unless there is a showing of fraud, self-dealing, dishonesty or incompetency." *Sonny Boy, L.L.C. v. Asnani*, 879 So. 2d 25, 27 (Fla. 5th DCA 2004).

The business judgment rule applies only "when a business is operating according to a reasonable business model." *Cox Enters., Inc. v. News-Journal Corp.*, 469 F. Supp. 2d 1094, 1111 (M.D. Fla. 2006). The question is whether the directors "followed a reasonable process and made an informed business judgment." *Copenhaver*, 2014 WL 12621202, at *7. But the rule "is not intended to serve as a shield for those who . . . have acted in their own personal self-interest." *Cox*, 469 F. Supp. 2d at 1111.

17

Likewise, the business judgment rule protects only disinterested directors. *United States v. De La Mata*, 266 F.3d 1275, 1297 (11th Cir. 2001). "Disinterested directors neither appear on both sides of a transaction nor expect to derive any personal benefit from it in the sense of self-dealing—as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.*

The business judgment rule was codified in section 605.04093, Florida Statutes (2015), which provides that a member in a member-managed LLC is not personally liable for damages regarding management or policy decisions unless, among other things, the member breached or failed to perform the duties as a manager so as to constitute: 1. "[a] violation of the criminal law unless the manager or member had a reasonable cause to believe his, her, or its conduct was lawful or had no reasonable cause to believe such conduct was unlawful"; or 2. "[a] transaction from which the manager or member derived an improper personal benefit, directly or indirectly." § 605.04093(1)(a), (1)(b)1. & 2., Fla. Stat. (2015). A member "is deemed not to have derived an improper personal benefit from any transaction if the transaction has been approved in the manner as is provided in s. 605.04092 or is fair to the limited liability company as defined in s. 605.04092(1)(c)." § 605.04093(3), Fla. Stat. (2015).

"Fair to the limited liability company" means "the transaction, as a whole, is beneficial to the limited liability company and its members, taking into appropriate account whether it is: 1. Fair in terms of the member's or manager's dealings with the limited liability company in connection with that transaction; and 2. Comparable to what might have been obtainable in an arm's length transaction." § 605.04092(1)(c), Fla. Stat. (2015).

In a proceeding challenging the validity of a transaction, the party challenging the validity has the burden of proving the lack of fairness of the transaction if:

> In a member-managed limited liability company, . . . the material facts of the transaction and the member's or manager's interest in the transaction were disclosed or known to the members who voted upon such transaction and the transaction was authorized, approved, or ratified by a majority-in-interest of the disinterested members even if the disinterested members constitute less than a quorum; however, the transaction cannot be authorized, approved, or ratified under this subsection solely by a single member[.]

18

§ 605.04092(4)(a)2., Fla. Stat. (2015).  If the conditions in subsection (4)(a) are not satisfied, then the party defending the transaction "has the burden of proving its fairness in a proceeding challenging the validity of the transaction."  § 605.04092(4)(b), Fla. Stat. (2015).

Here, the trial court erred in concluding that the business judgment rule protected Anthony's conduct, because Anthony was not a disinterested party to any of the transactions at issue (i.e., the $200,000 loan, the 2012 lease, and the 2014 addendum to the lease).  The trial court thus improperly viewed the case through the deferential lens of the business judgment rule.  Instead, the key inquiry is whether Anthony's self-interested transactions were valid under the law governing conflict-of-interest transactions for limited liability companies.[4]

Accordingly, the trial court erroneously relied upon the business judgment rule in determining that Aldo could not prove his claim against AVL for aiding and abetting a breach of fiduciary duty.

### Conclusion

We reverse the Amended Final Judgment to the extent that it adjudicated Aldo's claims against AVL, and we remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

LEVINE and CONNER, JJ., concur.

*          *          *

**Not final until disposition of timely filed motion for rehearing.**

---

[4] Believing that an appellate court should not make rulings in the first instance, we do not reach the issues of whether the transactions were fair to ASAP and whether there was gross negligence or bank fraud.  Without further comment, however, we reject Aldo's argument that the trial court's ruling violated the parol evidence rule.